In re COUNTRY WORLD CASINOS, INC., Debtor.

Bankruptcy No. 95–20563 RJB.

United States Bankruptcy Court, D. Colorado.

Nov. 5, 1996.

Arthur Lindquist–Kleissler, The Law Offices of Lindquist–Kleissler, Cooper & Moore, L.L.C., and Gary S. Cohen, The Law Offices of Gary S. Cohen, Denver, CO, for Debtor Country World Casinos, Inc.

Joseph E. Meyer III and Michael E. Romero, Pendleton, Friedberg, Wilson, Hennessey & Meyer, P.C., Denver, CO, for Claimant Tommyknocker Casino Corp.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER came on for hearing on September 24, 25, and 26, 1996, on the secured claim of Tommyknocker Casino Corp. ("TKCC"). On March 12, 1996, this Court ordered that the Debtor could proceed with a proposed financing plan whereby it obtained a new $5.0 million loan secured by a first lien on certain property in Blackhawk, Colorado, which property has been referred to in this case as the "Casino" property, as opposed to the "Hotel" property. Concurrently with this loan transaction, the Debtor was to use the proceeds of the new financing to pay certain claims secured by the Casino property, including, *inter alia*, the secured claim of TKCC. One of the purposes of this hearing is to determine the amount of TKCC's claim that is (or more appropriately "was") secured by the Casino property. In addition, the Debtor is asserting that it has an offset to that secured claim, and we are here to determine the validity and amount of that offset claim.

The first recorded appearance of Mephistopheles in the Blackhawk, Colorado, area was in the late winter or early spring of 1859 in the guise of a forty-year-old man who called himself John H. Gregory. Beelzebub's latest appearance in the area appears to have been about 1991 in the persona of Grady Sanders. However, from the litigation this Court has been involved with since Colorado authorized gambling in Blackhawk and Central City, Colorado, *El Diable* has set loose many of his maleficent spirits in the area and is not working alone.

Consider the parallels between Gregory and Sanders. Gregory came from out of state (Georgia via Wyoming) in the late winter or early spring of 1859 looking for gold. He found the first lode in the Colorado mountains.[1] However, within a couple of months, he decided that mining was too much work. He sold his claims for $21,000, or over $0.5 million in today's dollars, and

---

1. The information herein concerning the early history of the Blackhawk region is from *Inside the Mountains* (A History of Mining Around Central City, Colorado) by Terry Cox, Pruett Publishing Co., Boulder, Colorado, 1989) and from *Colorado's Colorful Characters* (by Gladys R. Bueler, Pruett Publishing Co., Boulder, Colorado, 1981).

became a consultant. He contracted with the inexperienced to prospect for them at the rate of $200 per day, or nearly $5,000 per day at current standards. He built a small stamp mill near the Gregory vein with part of his earnings, and after it was operational he quickly sold it for six times his cost. Over the next three years he wintered in Georgia and "consulted" in Blackhawk during the nice weather. He apparently left the region after 1862 and was never heard from again, until . . .

Sanders showed up in Colorado after stints in New Jersey, California, Texas, and Nevada looking for a bonanza he could harvest when and if Colorado approved gambling.[2] He moved in with an attractive lady much younger than himself, used her and her brother's name and corporation, and without one thin dime of his own at risk, he brokered the situation in which the parties here today find themselves. He received "consulting fees" ranging from $7,500 to $15,000 per month, plus shares of stock and promissory notes with a face value totaling nearly $1.5 million. And yet he never actually "received" such consideration. For you see, in modern times, even Lucifer is apprehensive of the IRS and must plan carefully. After all, look what the IRS did to him when he was going by the alias of Al Capone. Sanders has not filed federal or state income tax returns since 1989. He owes approximately $600,000 to the IRS for his activities involving a horse farm in California, and he hasn't had a bank account in this country in his name since 1993. He has had two permanent injunctions entered against him by the SEC for securities violations, one in 1979 and one in 1989, and he has been prohibited by the New Jersey Casino Control Commission from having any business with a casino operation in that state. He has had no "earnings." Rather all of his "consulting" contracts have been through a company called First Federal Mortgage & Loan. This company was listed as the "consultant" and the

consulting fees were paid to this company. In turn, Sanders' "living expenses" were paid by the company. He has not been paid a "salary" from the company since 1989. Of course he owned the company, or at least a major share. He did testify that in September 1995, the firm was sold to an "overseas investment company out of London and Toronto" and they asked him to stay on for six months, and extended that for three months "due to their own paperwork and some other things they had to do." In this case Sanders worked both sides. He was a "consultant" to TKCC and to the Debtor and had his various contracts extended when it suited his needs. And once the seeds of greed he planted were ripe and he had harvested his disproportionate share leaving only the thistles and husks, he abjured the realm. And the rest of the world should be on alert. According to Sanders he now "consults" on two other casino projects, one in Taiwan and one in China. The only reason he was able to testify in this case was that he had been scheduled to be in Taiwan and Manila for the entire month, but his business only took ten days and now he is between trips, but has to leave shortly for Frankfurt and Berlin for the same company. The incredible thing about Sanders' testimony is that he is probably telling the truth about these new casino projects and his international travel. He has already conned someone new and is currently milking them for all they have. But let's fill in the details.

Erica Hull began a personal relationship with Sanders in 1987 or 1988. Quite simply, they lived together until Sanders took it on the lamb in 1995. She was and is the President of TKCC and New Allied Development Corporation ("NADC"). In September 1990, she and her physician brother wanted to get a "public corporation" into which they could put his patents on certain medical items so that they could market these patents or the products thereof. They acquired NADC—

---

**2.** The Court is struck by the apparent fear of people to use the word "gambling." This fear is exhibited not only by the parties, witnesses, and attorneys in this case, but by the politicians, the press, and the citizenry of the state. Everyone is paranoid about being politically correct and instead uses the word "gaming." Judging from the caliber of people this Court has encountered that were attracted to Colorado by the new "gaming" laws, the undersigned judge is certainly not apprehensive about hurting *their* feelings and will, therefore, continue to call the matter by its true name, i.e., "gambling."

what is known as a "shell corporation."[3] According to Hull, NADC was a shell public corporation with no assets prior to the time she and her brother became involved with it. Then Sanders must have read the newspaper and learned that the people of this state were going to vote on whether to allow gambling in certain towns, including Blackhawk and Central City. So he started poking around. Sure enough he discovered that Mr. Campbell (whom Sanders has known since he was 19 years old) wanted to sell some land in Blackhawk, but he didn't want cash, he wanted stock "because he dibbles in all kinds of stock and has thousands of shares in all kinds of companies." So Sanders talked Hull and her brother into trying the casino business to raise funds to bring the good doctor's patented products to market. And lo and behold, Sanders got a "consulting" contract (excuse me, the Court should be more precise and state that First Federal Mortgage & Loan got the consulting contract) with NADC to handle all the negotiations for the purchase of the Casino property and to develop the project, including the acquisition of the financing. NADC did acquire the Casino property in December 1990, and the Hotel property in January 1991. What did NADC pay for the Casino property? According to Hull it was purchased for shares of stock in NADC worth $400,000. There is no explanation of how a shell corporation with no assets in 1990 can have just part of its shares be worth $400,000 in less than one year. Hull also testified that NADC is a "public" corporation that now has 4 million shares of stock outstanding to over 500 shareholders.[4]

But in the first part of 1992 NADC discovered that there was an environmental problem with the Casino property in the form of sulphur deposits left over from the old mining and smelting operations of the late 1800s. You must understand that Gregory and the

people that followed him to the Blackhawk area were not exactly "tree huggers," and they could have cared less about saving the whales. A professor at Brown University in Providence, Rhode Island, by the name of Nathaniel Hill came to Blackhawk in 1864 and started a smelting operation similar to that found in Swansea, Wales, to unlock the gold from the sulphur in the ore dug deep from the mountains. With this smelter, the mines, most of which had been closed because no one could economically extract the gold from the sulphur laden ore, reopened with a vengeance.

When the prospectors first rushed into the mountains in spring of 1859 they found lush forests of pine, cottonwood, and spruce. By September, though, they had stripped all the hills around Central City and Blackhawk bare for firewood, lumber, and mine timbers. Hill's smelter took great quantities of firewood, and the nearby hillsides that were not already stripped were plundered to feed the furnaces of the smelter. In fact, lumber and firewood had to be shipped in from 20 to 40 miles and further.

In the 1880s some people were alarmed at the exploitation of America's forests and demanded that they be conserved for the future. The then Secretary of the Interior, Carl Schurz, decided to prosecute westerners who removed timber from public lands. One suit was filed against Hill's smelter for $100,000. Hill turned to Henry Teller—yes, Teller the attorney and leading citizen of Central City who in 1872 at a cost of $87,000, built the Teller House—the largest and finest hotel in Colorado, and the Teller who had previously served as Secretary of the Interior (where he earned the name *Defender of the West*) and Senator. Teller pointed out to Schurz that there was no way for people of the West to get wood except to go upon the public lands for it, and he succeeded in secur-

---

3. There will be a lot of talk of "shell corporations" in this case. The undersigned recalls a previous case in this Court involving "shell corporations" and their formation and marketing. That was the case of the "King of Penny Stocks"—Meyer Blinder. Perhaps, now that Mr. Blinder has been paroled from Federal prison, his expert testimony could have been given here to provide a little more detail and color on these "shells."

4. As an aside, the Court has wondered throughout this hearing just what authority Hull has from the shareholders and directors of NADC because it appears that she has operated as if she is the sole shareholder and director with no fiduciary responsibilities to anyone else. The Court was also puzzled by the conspicuous absence of Hull's physician brother.

ing the passage of the *Timber Cutting Act* making it legal for anyone except a railroad to take timber for any purpose except export, and the suit against Hill was dropped. Even if Hill had lost the suit and been forced to pay the $100,000, he would have hardly missed it because of the large fortune he had already amassed in Colorado. So Hill continued to take timber from public areas and leave sulphur contaminated tailings on the land. So it was—wealth and political influence was used for the protection and enhancement of wealth and political influence. *Plus ça change, plus cést la même chose.*

NADC, via Sanders, then contacted the EPA and eventually entered into an Administrative Order on Consent for Removal Action [Exhibit 44] to clean up the property after hiring specialists to evaluate the nature and extent of the contamination and getting bids to remove the contaminated soil. [See Exhibits 40, 41, 42, 43, and 60]. But Hull said NADC didn't have any money. Again, the Court wonders how just a portion of its stock would be worth $400,000 if it didn't have any money. Remember, the casino project was to make money so the doctor's patents could be developed. Hull testified that they were thinking about forming a general partnership to develop the property, and for reasons unstated, wanted to have the Casino property in a separate corporation for this partnership formation. So the title to the Casino property was transferred to Tommyknocker Casino Corp. or TKCC [5] (another "shell corporation" wholly owned by NADC) in the spring of 1992. In late 1992, Hull decided to sell the Casino property. The property was listed at $12 million, which price was, according to Hull, its appraised value.

At some point in time prior to July 1993, Sanders met some prospective purchasers for the property—Lynn Dixon, Abe Solomon, Sal Lorea and another gentleman from a group known as White Rock Partners. It was Sanders' understanding that Dixon and Solomon were shareholders in a company called Monolite, and that Dixon's live-in girlfriend, Suzanne Sullivan, was the President of Monolite. (Sound familiar?) Ultimately, a contract for the purchase and sale of the Casino property was entered into between TKCC and NADC on one side and Monolite Industries and Monolite Subsidiary Corp., described in the contract as a "corporation in the process of being formed in the State of Nevada as a wholly-owned subsidiary of Monolite Industries, a publicly-held Nevada corporation." The parties all agree that whatever Monolite entity was involved, the ultimate purchaser of the Casino property was renamed Country World Casinos, Inc., the Debtor herein. Hull signed as President for TKCC and NADC and Suzanne Sullivan signed as President for the buyer corporations. According to Hull, Monolite was also a shell public corporation with no assets until shortly before the closing of the purchase contract when it received $600,000 from a private placement. She also testified that it was her understanding that Monolite would be raising additional funds through a "Reg S offering" which to her meant an "offshore offering." It truly amazed the Court to hear Hull testify so glibly about such terms of art as "shell public corporations," "wholly owned subsidiaries," "Reg S offerings," "private placements," and "offshore offerings." Her background would not indicate that she developed any special expertise in such matters. She received a B.S. in retailing in 1980 from Michigan State University, and she has taken some real estate courses in connection with her real estate sales license. Her work experience was described as "Primarily in the restaurant, night club business, as well as the apparel business." She said she designed clothes for an apparel manufacturer and that she worked for several manufacturers in sales. But before a vision of Erica Hull is formed as an attractive, but naive young lady who was taken advantage of by that dirty old man Sanders and all others here involved, the Court should, and will, point out, *infra*, that she was no paragon of rectitude either.

Between the time the property was purchased by NADC and July 1993, architects and engineers were retained to design a casi-

---

**5.** For those unfamiliar with mining lore, "Tommy knocker" is the ghost of a man killed in a mine and is supposedly responsible for the creak-ing of timbers in a mine, not to be confused with "Tommy Atkins," the British equivalent of the American "GI."

no. The primary architectural firm retained was Semple Brown Roberts, P.C., but the group also included Moy–Nassar Associates, Inc., Martin/Martin, Inc., and M E Engineers, Inc. NADC could not pay for their services so mechanics' liens were threatened or actually filed. In March 1993, the architects and engineers were persuaded by NADC and TKCC to accept a promissory note and first priority Deed of Trust upon the Casino property in lieu of their mechanics lien claims. Throughout the hearing and the pleadings this is referred to as the "Semple Brown" note and Deed of Trust. The promissory note was dated March 3, 1993, for the face amount of $475,000 and a copy can be seen attached to the "Semple Brown" Proof of Claim filed herein on June 18, 1996, as Claim No. 23. The Deed of Trust contained a "due on sale" clause and can be examined as Exhibit 10.

On July 14, 1993, Monolite and TKCC/NADC entered into their first contract for the purchase of the Casino Property. [Exhibit 1]. On July 29, 1993, the parties entered into a superseding contract. [Exhibit 2]. The contract provided for a total purchase price of $11,492,500 to be paid as follows: $600,000 cash down; a promissory note for $3,450,000 at 8% per annum with payments over 10 years to commence when a casino is built and opened or 15 months from the closing date, whichever occurred first ("Debtor's note"); and 2,250,000 shares of Monolite, nondividend paying convertible, preferred stock with a stated value of $3.33 per share. The closing took place on August 6, 1993. However, TKCC had to somehow deal with the Semple Brown note and Deed of Trust and the "due on sale" clause. So TKCC got the Semple Brown parties to agree to an amendment of the note and Deed of Trust to provide that when TKCC/NADC had received a total of $725,000 in principal from the Debtor under the Debtor's note, then the Semple Brown note had to be paid in its entirety. [See Exhibit 11.] A similar provision to that contained in the Semple Brown amendment was inserted into the purchase contract as ¶ 8.f) in Exhibit 2 and it reads as follows:

   f) Upon payment of at least $725,000 as a principal reduction pursuant to Paragraph

7 hereof, the first and second mortgages, currently encumbering the Real Property ("The Prior Liens"), will be paid in full and the Real Property will be free and clear of all liens and encumbrances other than the "Permitted Exceptions" set forth in Exhibit "B" attached hereto, and the deed of trust created pursuant to the terms hereof.

A similar provision was inserted into the Debtor's note on page 2 [Exhibit 3]:

Notwithstanding the foregoing, in the event that Holder [TKCC] receives from Maker [Debtor] a minimum of SEVEN HUNDRED TWENTY–FIVE THOUSAND DOLLARS ($725,000) as the Accelerated Principal and Interest Payment, Holder shall immediately secure the release of the lien of that certain Deed of Trust and Security Agreement encumbering the Property [the Semple Brown Deed of Trust]....

The Debtor's note was signed by Suzanne Sullivan as President of Country World Casinos Inc., a publicly-held Nevada corporation formerly known as Monolite Industries. Each page of the note was initialed by Suzanne Sullivan and by Erica J. Hull, except that the last page contains no initials. In effect, the Semple Brown note was "wrapped" by the Debtor's note, and the Semple Brown parties agreed [see Exhibit 9] to waive the "due on sale" clause of their Deed of Trust in return for the promise of TKCC to pay them off as soon as it received $725,000 from the Debtor, Country World Casinos, Inc.

Well the Debtor was not a knight in shining armor either. Remember, it started out with no assets, i.e., it was a shell corporation, and raised $600,000 in a private placement in order to close this sale. In addition, it agreed in the sale contract [Exhibit 2] to use its best efforts to sell up to 3.2 million "post-split" shares of its common stock to raise another $3.0 million. This was to be the "Reg S offshore" fund raiser Hull talked about. The Debtor was expecting to receive about $3.0 million from this "offshore" transaction, and two-thirds of the funds received from that offering, up to a maximum of $950,-000, was to be paid to TKCC to reduce the

principal due on the Debtor's note. [See ¶ 7 of Exhibit 2.]

But the $3.0 million was not forthcoming. Instead the Debtor only received about $600,000 from the sale of its stock in January 1994. That meant the Debtor should pay TKCC $400,000. But it didn't want to do that. Instead it proposed to pay only $250,000. The parties finally agreed on February 3, 1994, to amend the July 29, 1993, purchase agreement by executing Exhibit 15. This amendment did several things, *inter alia:* (1) it allowed the Debtor to pay only $250,000 at that time and specified that the Debtor would pay $350,000 on May 1, 1994, and again on August 1, 1994; (2) it changed the nonvoting preferred stock received by TKCC at closing to voting stock; and (3) it allowed TKCC to file a stock registration certificate for TKCC's preferred stock with the SEC if the Debtor had not already done so by April 15, 1994. The original agreement called for the Debtor to file a registration statement "as soon as practicable after the Closing Date." [See Exhibit 2—Addendum, p. 2, ¶ 7]. The parties subsequently made two further amendments (March 31, 1994—Exhibit 16 and August 12, 1994—Exhibit 17), both of which further delayed payment of the balance of the $950,000. But the Debtor couldn't make the payments as agreed, and TKCC declared a default on the promissory note and Deed of Trust on November 18, 1994, and gave the Debtor 20 days to cure. [Exhibit 18.] That cure date was extended twice more to January 10, 1995. [Exhibits 20 and 21.] On January 13, 1995, the Debtor paid TKCC $551,774.74. [Exhibit 24.] This cured the default.

Now where did the Debtor get this money? It got it from Holly Products ("Holly"),[6] a public corporation in New Jersey. How did they get involved? Well it seems Holly was brought to the table by those "investment bankers" known as White Rock Partners whose offices were located in Manhattan. The Chairman of the Board of Holly, Larry Berman, testified that he had done business before with Abe Solomon from New Jersey and Lynn Dixon from Salt Lake City, and that White Rock Partners was the "investment banker" for Holly. In fact White Rock did a "secondary offering" for Holly to raise money. Remember, it was Dixon and Solomon who used the shell Monolite to purchase the Casino property from TKCC. In any event, in December 1994, Dixon and Solomon convinced Berman to get involved with the Debtor. Berman didn't know that Dixon's live-in girlfriend "was a substantial stockholder" in the Debtor. The three of them came to Denver in January 1995 (Berman with a $600,000 check), and met with Sanders. By this time Sanders was working under a consulting contract with the Debtor and was working out of the Debtor's offices in Denver. Berman, Sanders, and Hull apparently worked out an agreement whereby there would be a stock exchange between Holly, TKCC, and NADC whereby Holly would give NADC/TKCC some of its stock and in exchange would receive some or all of the Country World stock held by NADC/TKCC, and a letter of intent was worked out. Berman stated that this deal was how he planned to gain control of the Debtor. Then Berman left the meeting to go and see the Casino property in Blackhawk. Upon his return, the letter of intent had been signed by Hull for NADC and TKCC, and Berman gave the $600,000 check to the Debtor. This is where the Debtor got the money to cure its default. But where did Holly get the money?

Holly got the money through the efforts of White Rock. Holly actually borrowed the money, plus an additional $400,000, from "offshore" sources. As Berman explained it "No, the lenders were—one was from London. They were offshore. The lenders who lent us the money were offshore people." It seems a lot of "offshore" people are involved in this case. Take a look at the list of the eight largest shareholders of the Debtor on December 8, 1993, contained in Exhibit K. They come from such places as Panama

6. Holly Products, Inc. is one of the two parties involved here which were actually engaged in an activity useful to society. Up to September 1995, it produced wood products, i.e., bases for slot machines, cabinets for hospitals, and "fancy architectural millwork." The other party was Steve Anderson of Petroleum Constructors who supervised the environmental cleanup of the Casino property and saw to the removal of all those tailings left by Gregory, Hill, *et al.*

City, Panama; Curacao, Netherlands, Antilles; and Lugand, Switzerland. Where do all these "offshore" entities get their money? Some of it, of course, comes from legitimate foreign nationals investing in companies in the United States. But all "offshore" investors should be examined with care, for many of them are merely fronts used by citizens of this country to avoid taxes, or other legitimate regulation, or to simply launder and hide funds that others may have a legitimate claim to, such as former business partners or former spouses. And some are merely fronts for organized crime or drug lords, both foreign and domestic. This Court has no evidence that any of the "offshore" entities involved here are anything but legitimate. But it certainly seems odd that companies like the Debtor cannot attract legitimate lenders and investors "on shore." Perhaps it is because characters like Sanders are involved. All they know is how to play the "shell" game—pun intended—and no legitimate lenders and investors want anything to do with them. This Court has searched for the one party or principal in this case that could rightfully claim to be the "White Knight," and it has been unable to find one. Everyone involved is tainted to some degree.

Once the Debtor had cured the default, Hull admits that TKCC was then required to get a release of the Semple Brown Deed of Trust. But to her that did not mean she had to pay off the Semple Brown promissory note. Instead, she testified, she thought the Semple Brown parties had charged too much in the beginning and so she never intended to pay them the $475,000. She always intended to try and chisel them down, even after she had signed the Semple Brown promissory note on March 5, 1993, even after she had signed the sales contracts on July 14 and July 29, 1993, which required pay off of Semple Brown, and even after she signed an Amendment to the Semple Brown promissory note on August 6, 1993 (attached to Proof of Claim No. 23), which provided for TKCC and NADC "to pay the entire principal balance and all unpaid accrued interest" when TKCC had received the $750,000 from the Debtor. Hull made no pretensions in Court about what her intent was from the beginning. She simply never intended to abide by her promises and contractual obligations to pay Semple Brown $475,000. Only when she was in a position of "power" would she show her hand, and to her that was when she had a check for over $0.5 million in her hand, the greater share of which belonged to someone else. So she sent Sanders to try and work a deal.

Sanders met with Russell "Rusty" Brown on February 8, 1995, and some other members of the Semple Brown group. At first Sanders told them that all TKCC and NADC had was $267,000 and that they should take $250,000 as full and final payment on their $475,000 note, and if they didn't it would force TKCC and/or NADC to file bankruptcy. And, of course as all accomplished con-men do, Sanders said Semple Brown had to act that day, or TKCC/NADC would not have even the $250,000 available to pay. Semple Brown turned down the offer. So Sanders increased it to $275,000. That proffer was refused. Then Sanders came forth with a cash-stock offer. After the meeting with Sanders, Brown wrote Hull a letter [Exhibit 27] which can be characterized as a counteroffer wherein Semple Brown agreed to accept $250,000 cash immediately; $200,000 plus accrued interest to be paid with common stock of Holly Products, Inc. (remember, Sanders, Hull and Berman had just agreed in principle to a stock swap for Holly stock); full execution of a pending architectural contract between Semple Brown and the Debtor; and a payment schedule for payment of fees owing to Semple Brown by the Debtor for work already performed for the Debtor which already amounted to about $300,000. The members of the Semple Brown group signed this letter, but Hull did not. But the Court must point out that even Semple Brown does not wear the white hat. Semple Brown had done some work for the Debtor after the Debtor purchased the Casino property, but the Debtor had not yet agreed to a full fledged contract to have Semple Brown be the primary architect on the casino itself. So assuming that TKCC/NADC was in a bind (because Semple Brown believed that TKCC/NADC could not pay off the note in full) they thought they could

leverage TKCC/NADC to put pressure on the Debtor to hire them. And, even though that was perfectly legal, it certainly shows the avarice of Semple Brown. But, here's the topper, Rusty Brown owns 125,000 shares of NADC. Did Brown tell the other members of the Semple Brown group that he was a shareholder, and therefore could have some conflicts of interest? The evidence did not reveal that he did. As Mr. Brown admitted, he "wanted to be everybody's friend and architect." I can certainly understand why when he ran up fees of $475,000 with NADC. and then another $300,000 with the Debtor just to design one casino for which a building permit has not yet been issued. Did anyone think to check whether Semple Brown billed both clients for the same work? Did anyone involved in this case ever consider any possible ethical problems or conflicts of interest issues? Apparently not. In any event, Brown and Hull had some discussions regarding the Semple Brown note and Deed of Trust, including at least one meeting at the offices of Hull's attorney in late March 1995. Eventually, Semple Brown's attorneys and Hull's attorneys got into the discussions, but nothing was resolved and the discussions broke off in late April 1995.

About that same time, Semple Brown was contacted by Holly and told that Holly wanted to buy the Semple Brown note. These discussions lasted a few weeks and were fruitless. In July 1995, the Semple Brown attorneys began preparing for foreclosure. They ordered a foreclosure certificate and a litigation guarantee. However, Holly started up further discussions and made various offers in September 1995. But these discussions ended when the Debtor filed its bankruptcy petition on October 12, 1995.

In the meantime, Holly and NADC/TKCC were working on their stock swap. Sanders called William Patrowicz, the President of Holly, in the first week of March 1995 and said he wanted to come and look over their operation in New Jersey. According to Sanders, he was "doing consulting work for an Indian tribe out of Oklahoma and was back in New Jersey meeting with city officials on possibly locating a casino in that particular city." He said Hull called him and asked that he go to Holly and take a look at their operation as part of her "due diligence" on the stock swap. Mr. Berman's and Mr. Patrowicz's recollection of their meeting with Sanders was that he wanted to change the whole deal. He wanted more Holly stock than what was agreed to and unless Sanders did the deal, there was no way the deal would be made. Sanders denies that, and testified that he was just there to look around and that Berman threatened that if Hull didn't go through with the deal he (Berman) would put the "big squeeze" on her. Everyone agrees that there was a heated argument with obscenities exchanged. Berman denied ever using the term "big squeeze" in his entire life. Apparently, the term originated with Mr. Shapiro, the attorney for Holly in his conversation with Mr. Cerkovnik, attorney for Hull/NADC/TKCC after Hull refused to go ahead with the stock swap. According to Cerkovnik the "big squeeze" was to be a three-pronged attack to gain control of the Debtor by Holly. One step was taken in April 1995 when Holly sued NADC and TKCC in New Jersey state court under the stock exchange agreement. At about the same time an attorney for the Debtor, Andrea Bloom, sent a demand letter to NADC/TKCC demanding that the release of the Semple Brown Deed of Trust be accomplished within 48 hours. The record is not clear as to what the third prong of the attack would be. By purchasing other stock and by receiving stock in exchange for the $1.0 million (including the $600,000 in January 1995) infused into the Debtor, Holly did gain control of Country World by the spring or summer of 1995.

In addition to paying the $551,774.74 to TKCC in January 1995, the Debtor also began making monthly payments of $33,184.30 in accordance with the Debtor's note. But after the payment in April 1995, no further payments were made. Because the Debtor ceased making the monthly payments, TKCC sought to foreclose on the Casino property in Colorado state court, even though it had never performed its obligation to get the Semple Brown Deed of Trust released. As a result, the Debtor filed its bankruptcy petition on October 12, 1995.

But the story is not yet complete. When the Casino property was sold to the Debtor, there was a recognition by the parties of the contaminated soil problem. That problem was dealt with in ¶ 15 of the July 29, 1993, agreement [Exhibit 2]:

15. Monolite [Country World] is agreeing to purchase the Real Property upon the assumption that NADC has received EPA general approval of a cleanup program on the Real Property. Monolite's obligation to close the acquisition is subject to the condition that none of the parties hereto shall have discovered any materially adverse environmental problems with the Real Property or that the cost of the currently proposed cleanup work shall not materially exceed the present estimate of $200,000 to $250,000 to complete.

As stated, *supra*, Sanders, Hull, NADC/TKCC had engaged experts to analyze the soil problem and submit bids for the clean up. This was all revealed to the Debtor including the Administrative Order on Consent for Removal Action [Exhibit 44], the EPA approval of the cleanup plan. And it was uncontroverted that according to all the information available to Sanders, Hull, NADC and TKCC at the time of the sales agreement in July and at the time of the closing in August 1993, the total cost to clean up the property was estimated to be $200,000 to $250,000. Well, because of several factors, including the fact that the work was accomplished in the winter which was more difficult, and that the contamination was much more extensive [7], the final costs exceeded $600,000.

To complicate matters, it was discovered that if the Debtor attempted to accomplish the cleanup on its own, it would have to go through the time consuming process of gaining EPA approval. Therefore, the parties agreed that TKCC would "front" the cleanup, i.e., all of the work would be done under the auspices of TKCC, and that Sanders would be given one of his infamous "consulting agreements" by the Debtor to oversee the matter. That is how it came about that Sanders went from being a consultant to NADC/TKCC to being a consultant to the Debtor. But it must be remembered that he and Hull were still living together at this time. TKCC would see that the work was accomplished, pay the contractors, and get reimbursed by the Debtor. And that is just exactly what happened.

Finally, in the sales agreement, as amended, NADC/TKCC received certain shares of stock in the Debtor. The agreement originally was that the Debtor would file a registration statement with the SEC in hopes that this stock could then be freely distributed by NADC/TKCC. That was never done. Although, as pointed out, *supra*, one of the amendments to the sales contract [Exhibit 15] provided that if the Debtor did not file such a registration statement by April 15, 1994, then NADC could file the statement itself and have the Debtor pay the cost thereof. This cost was estimated by various witnesses to be from $20,000 or $30,000 to over $100,000. The reason no registration statement was filed was because the SEC was investigating the Debtor and NADC. Why were they being investigated? Quite simply it was because of their association with *El Diablo*—Grady Sanders. The evidence showed that it would at least be futile to file a registration statement with the SEC while under SEC investigation and perhaps foolhardy to do so. In any event, about two months prior to the hearing herein, the SEC notified the Debtor that it was no longer under investigation.

That brings us to the claims of the parties, or more precisely, the finger pointing of the parties. Debtor claims NADC/TKCC breached their agreement because the Semple Brown Deed of Trust was not released immediately. NADC/TKCC counters by claiming the Debtor breached the Debtor's note and Deed of Trust by not continuing to make the $33,184.30 monthly payments and that therefore default interest of 18% and attorney's fees are due from the Debtor. To which the Debtor retorts that NADC/TKCC should reimburse the Debtor for all the envi-

---

**7.** Originally it was estimated that 2000 cubic yards of contaminated soil had to be removed. It turned out that over 6000 cubic yards had to be removed and disposed of at an EPA approved dump site.

ronmental cleanup costs over and above $250,000. But, NADC/TKCC cries foul because the Debtor never filed an SEC registration statement.

Was NADC/TKCC required to immediately obtain the release of the Semple Brown Deed of Trust on behalf of the Debtor? The parties agreement in ¶ 8.f) [Exhibit 2] says that "upon the payment of at least $750,000 as a principal reduction payment ... the first and second mortgages ... will be paid in full and the Real Property will be free and clear of all liens and encumbrances ..." The Debtor's note [Exhibit 3] does provide that "... in the event that Holder receives from Maker a minimum of ... ($750,-000) ... Holder shall immediately secure the release of the lien...." The attorneys herein make much ado about the principle that provides that the breach of one contract does not relieve performance of a separate contract by the aggrieved party. They then proceed to argue about which party breached first. It is this Court's opinion that all of these separate documents constitute but one agreement, i.e., the purchase and sale agreement [Exhibit 2]; the Debtor's note [Exhibit 3]; the Deed of Trust [Exhibit 4]; the Bill of Sale [Exhibit 5]; the Warranty Deed [Exhibit 6]; and the amendments thereto of February 3, March 31, and August 12, 1994 [Exhibits 15, 16, and 17, respectively]. This is because the actions of the parties treated them as such. Specifically, the amendments that occurred after the closing on August 6, 1993, went to the heart of the original transaction and, in effect, revived the sales and purchase agreement [Exhibit 2] which normally would have been merged into the Warranty Deed, Deed of Trust, and Debtor's note. For example, Exhibit 15 changes the preferred stock TKCC was to receive from nonvoting to voting, set a date for the Debtor to file an SEC registration statement and if none was filed gave NADC the right to file such a statement, and altered the payment schedule under the Debtor's note. Exhibit 16 again altered the payment schedule under the Debtor's note. And Exhibit 17 gave the final payment schedule under the Debtor's note. What does this mean? It means that even though there was no specific affirmative obligation on TKCC to obtain the Release of the Semple Brown Deed of Trust contained in the document labeled as Exhibit 3, there was an affirmative obligation in the agreement as a whole, and that obligation was "immediate." Now what does "immediate" mean? It means what the parties here intended it to mean. How do we know what they intended? The best indication is by their actions, and they had an earlier opportunity to display what they meant by "immediate." One of their amendments, Exhibit 15 dated February 3, 1994, provided that in connection with the purchase of the Hotel property the Debtor was to issue 250,000 shares of its common stock to NADC "immediately" upon the acceptance of the amendment by NADC. When did the stock actually issue? The stock was not issued until May 1994, or about 90 days later. So what did "immediately" mean in connection with the Semple Brown Deed of Trust? Well, TKCC received the triggering amount in mid-January 1995, and about 90 days later would have been mid-April 1995, or about 2 weeks after the Debtor's last payment on the Debtor's note. Thus, this Court finds and concludes that TKCC and the Debtor both breached the agreement simultaneously in April 1995—the Debtor by not making further required payments under the Debtor's note, and TKCC by not "immediately" obtaining the release of the Semple Brown Deed of Trust. That being the case, neither party is a "prevailing party" and therefore must pay their own attorney's fees, and TKCC is not entitled to default interest, but is entitled only to 8% per annum on the unpaid balance. The parties did not present any specific detail of what this amount would be, but the matter is capable of easy calculation, and the Court will direct the parties to confer and agree on that calculation. In any event, the interest shall be calculated on an actual daily basis, and not on a "360–day" year. The Debtor's note does not specify such a "360–day" year, and even if the accountants do use such basis for calculations in their profession, there was no evidence that the parties here are accountants or that they intended to use a "360–day" year in their calculations.

TKCC asserts that the Debtor breached first because it did not file a regis-

tration statement with the SEC as agreed. The original agreement on July 29, 1993 of the parties provided in ¶ 7 of the Addendum to Exhibit 2 that the Debtor shall file a registration statement with the SEC "as soon as practicable" after the closing. But in the February 4, 1994, amendment at ¶ 3, the parties agreed that if the Debtor had not yet filed the registration statement by April 15, 1994, then NADC would have the right to file such statement and the Debtor would pay all the costs thereof. The reason TKCC/NADC wanted a registration statement filed in connection with the stock it received from the Debtor was so that such stock could be publicly sold or distributed. However, the mere filing of a registration statement does not obtain the required effect. Once the statement is filed the SEC must review the facts and circumstances and let the statement "go effective" before the stock can be publicly sold or distributed. The uncontroverted testimony was that because the Debtor was under investigation by the SEC, it was most probable that the SEC would not let the registration statement go effective. In fact, the evidence showed that filing a registration statement when under an SEC investigation may even harm the ultimate chances of going effective. The law does not require a person to do a useless or futile act. Therefore, the Court concludes that the failure of the Debtor to file a registration statement with the SEC was not a breach of the parties' agreement. In addition, by their amendment of February 3, 1994, the parties modified the original obligation of the Debtor from the requirement that the Debtor file the statement to the requirement that the Debtor file or pay for the filing of the statement. Thus, under the amendment, until the statement is filed by NADC and the Debtor fails to pay for the registration, the Debtor is not in breach of the agreement.

█ Finally, we come to the offset claim of the Debtor. The Debtor claims that it was the responsibility of TKCC to pay for the environmental cleanup of the property which was about $650,000, or at least that TKCC should pay for everything over $250,000. This assertion is the result of the fanciful musings of attorneys desperate to justify their fees. The Debtor is not entitled to an offset for two reasons. First, the agreement of the parties never required TKCC to bear the costs of cleanup. Exhibit 2 at ¶ 15 provides as follows:

> 15. Monolite [Debtor] is agreeing to purchase the Real Property upon the assumption that NADC has received EPA general approval of a cleanup program on the Real Property. *Monolite's obligation to close the acquisition* is subject to the condition that none of the parties hereto shall have discovered any materially adverse environmental problems with the Real Property or that the cost of the currently proposed cleanup work shall not materially exceed the present estimate of $200,000 to $250,-000 to complete. [Emphasis added.]

What that paragraph did was give the Debtor a chance to back out of the deal *prior to closing* if it was discovered that the cleanup would be substantially more than $250,-000. The evidence was uncontroverted that all the estimates and bids and even the EPA consent order were fully disclosed to the Debtor prior to closing and that it was only after the closing and after the work had begun that it came to light the costs were going to exceed the original estimates. Secondly, the evidence was unchallenged that when the parties discovered that the Debtor would have to start the administrative process all over with the EPA, they agreed that TKCC would perform under the consent order [Exhibit 44] to get the property cleaned up, and that the Debtor would reimburse TKCC for its costs. This agreement was not in writing. However, the parties performed that agreement in toto. Sanders was hired as a "consultant" to oversee the process, which he did. The contractors' bills were submitted by Sanders to the Debtor and were reviewed with some great care, and then the Debtor reimbursed TKCC for the full amount of the costs—$650,000. The Debtor never informed TKCC that everything over $250,000 was TKCC's responsibility until after the cleanup was completed and paid for.

The Debtor in its final brief herein filed October 18, 1996, takes 56 pages to put forth what can best be described as the Flip Wil-

son defense, i.e., "The Devil made me do it." That brief attempts to show that the Debtor, TKCC, Hull, and all the officers and directors of the Debtor prior to the take over by Holly, were under the direct control of Grady Sanders. The argument basically is that because Sanders controlled the Debtor, the Court should not consider the fact the Debtor paid all the cleanup costs without objection as evidence of the parties' intent. But if the Court accepted this "control" argument, then it follows that TKCC and Hull were likewise controlled, and therefore, the Court should not consider their actions as reflecting their true intent on other matters, such as the failure to obtain the release of the Semple Brown Deed of Trust. The sword cuts both ways. The Debtor was and is a "public corporation" with diverse shareholders. If those shareholders believe that they have a cause of action against Grady Sanders they are certainly free to pursue that action. But their failure to protect their corporation from the "control" of Sanders cannot not be grounds to assert a $400,000 claim against TKCC. There is no showing that TKCC "controlled" the Debtor.

As stated at the outset, the purpose of this hearing was twofold: (1) to determine the amount of the secured claim of TKCC; and (2) to determine the validity and amount of the offset to that claim asserted by the Debtor. Based upon the foregoing findings and conclusions, it is

ORDERED that the secured claim of Tommyknocker Casino Corp. on the real property known as the Casino property is an amount easily calculated by the parties in accordance with this opinion and they are ordered to confer and agree on a specific dollar amount. If they cannot so agree within ten (10) days of this Order, the Court will set a forthwith hearing to take evidence on that issue only and will assess costs and attorney fees to the prevailing party. It is

FURTHER ORDERED that the Debtor is not entitled to any offset to the secured claim of Tommyknocker Casino Corp.